**In re William V. STROH, Debtor.**

**Glenn H. VARNEY, Plaintiff,**

v.

**Quentin M. DERRYBERRY, II, Trustee, Defendant.**

**Bankruptcy No. 82–02113.
Adv. No. 82–1090.**

United States Bankruptcy Court, N.D. Ohio, W.D.

Feb. 13, 1984.

Harold M. Hanna, Hanna & Hanna, Bowling Green, Ohio, for plaintiff.

Quentin M. Derryberry, II, Wapakoneta, Ohio, Trustee/defendant.

## OPINION AND ORDER

WALTER J. KRASNIEWSKI, Bankruptcy Judge.

This matter came on for trial on November 4, 1982 on the complaint of Glenn H. Varney to determine his interest in certain crops as against Quentin M. Derryberry, II, the trustee in bankruptcy. For the reasons discussed below, the Court finds that Plaintiff has no interest in the crops in question but is an unsecured creditor in this case under Chapter 7 of the Bankruptcy Code.

## FACTUAL BACKGROUND

On March 6, 1982 Glenn H. Varney, the plaintiff, met with William V. Stroh, the debtor, to discuss a proposed arrangement whereby Stroh would farm certain land owned by Varney in Shelby County, Ohio. The meeting was arranged by James Titus, Varney's brother in law. Titus had farmed Varney's land on a share cropper basis for the past 15 years but, due to advancing years and other responsibilities, no longer wanted the responsibility of farming Varney's land.

At the March 6 meeting the parties discussed, in general terms, their respective concerns and interests regarding the arrangement. Varney needed approximately $6,500 to $7,500 from the property in question to meet his obligations. This was within the range of what he had received from his brother in law in the past under their arrangement. Stroh, who farmed land on a cash rent basis with approximately 10 other farmers, generally paid his landlords about $100–$125 per acre for renting their land.

According to Stroh, the parties reached an agreement in principle that Stroh was to pay Varney $125 per acre as rental for the use of Varney's land. Stroh was to have his attorney draw up a lease agreement, leaving the price per acre and number of acres blank, and this was to be submitted to Varney for his consideration and approval. The parties generally agreed that Varney had about 60 tillable acres available for farming.

Varney was less certain as to what agreement, if any, he had reached with Stroh on March 6, 1982. Although he acknowledged, in general, terms the context of the discussion with Stroh, he denied having reached an agreement with regard to the rental of his land. According to Varney, the net result of the March 6, 1982 meeting was that he was to examine and consider whatever written agreement Stroh submitted to him for approval. Varney was to receive the written agreement within two to three weeks from the parties' first meeting.

When no agreement was sent to Varney, he made several phone calls to Stroh's house to find out why the agreement had not been received. Each time Varney called, however, Stroh was unavailable. Instead Varney spoke to Stroh's wife who explained that she and her husband were making continuing efforts to obtain the contract from their attorney. No written agreement ever materialized.

Despite the lack of any formal written agreement, in April and May of 1982, Stroh planted approximately 58 acres of corn on Varney's land and continued to farm it throughout the summer. July came and went but Varney received no partial payment from Stroh as had been discussed at their initial meeting.

Finally, on September 11, 1982, the parties had a brief meeting in front of Stroh's house. Among other things, the parties acknowledged that Stroh was experiencing financial difficulties due to a drop in the market price for corn. Varney urged Stroh to harvest the growing corn and to deposit the first $7250 of the proceeds of the corn, after expenses, into Varney's name at a local grain elevator. Stroh acknowledges this discussion but denies ever having agreed to this arrangement since, among other things, he was unsure at the time whether the Metropolitan Bank had placed a lien on his crops.

In an effort to formalize his proposal, on September 13, 1982 Varney sent Stroh a letter (Defendant's exhibit # 1) which provided, in relevant part, as follows:

I'm satisfied with the arrangement we put together last Saturday regarding the lease payments. Just to confirm; it is my understanding that you will shell our corn first and that the first $7250.00 of corn will be sold to Botkins Grain in my name. The $7250.00 is 58 acres time $125 per acre. The net amount is $7250.00 after all drying and other costs. Jim said he would be glad to help you transport the corn to Botkins.

Hopefully, this will work out for both of us. I'm currently in need of the cash.

Stroh never responded to either the proposal urged by Varney at their meeting on September 11, 1982 or the letter sent to him on September 13, 1982. Instead, Stroh filed a petition under Chapter 7 of the Bankruptcy Code and Quentin M. Derryberry, II was appointed trustee.

## DISCUSSION

Plaintiff has urged three alternative theories for a recovery of a portion of the crop in question. First, plaintiff argues that he had entered into a cropping agreement with Stroh under which he was owner of and was to receive the first $7250 of the proceeds of the crop harvested and sold to the grain elevator. Second, Plaintiff argues that, whether their relationship is characterized as that of owner and cropper

or landlord and tenant, since plaintiff reserved as payment for the use of his land a portion of the crops to be grown on the land, the parties are tenants in common in the crop and the proceeds thereof by virtue of a line of decisions of the Ohio Courts. Last of all, under the so-called "advancement" theory, plaintiff claims that, since Stroh failed to make an installment payment to him, plaintiff can be said to have advanced money to Stroh to assist him in cultivation of the crops and that, under these circumstances, the Ohio courts have recognized that the parties are tenants in common in the crop.

In opposition, the Trustee urges that the parties' relationship be characterized as a land lease and that, therefore, plaintiff has no claim or interest in the crop or the proceeds thereof but is an unsecured creditor for the amount of the rental due or $7250. In the opinion of the Court, under the circumstances of this case, the Trustee's position more approximately characterizes the parties' arrangement.

The question of whether Varney and Stroh had the relationship of "owner and cropper" or "landlord and tenant", under the common law, was of critical importance in determining who held the title to the crops:

Relations between the owner of the land and one contracting to grow a crop thereon were generally classified at common law either by the terms 'owner and cropper' or 'landlord and tenant.' Where the relation was that of owner and cropper, the title to the whole of the growing crop was in the owner and subject to sale by him or to be levied on as his property. Where the relation was that of landlord and tenant, the title to the whole crop was in the tenant, with the full power of disposal, voluntary or involuntary.

*Second National Bank v. Hyde*, 29 Ohio App. 357, 362–63, 163 N.E. 587, 589 (1928). *See also Stoner v. Markey*, 63 Ohio App. 459, 27 N.E.2d 176 (1940). Thus, under the relationship of "owner and cropper", the general rule is that the exclusive property in the crops is in the landowner until he has

set apart the employee's share. Contrariwise, under the "landlord and tenant" relationship, where the land is leased, the whole product of the land rented, the general rule is that the title to the crops is in the tenant until the share of the lessor is separated and delivered. *See generally,* 21A Am.Jur.2d, Crops, § 43.

Since the characterization of the arrangement may thus be of such paramount importance, it is thus useful to further define and distinguish a "cropper" from a tenant:

> Where the landowner furnishes the land and supplies and other things of that sort, keeps general supervision over the farm, and agrees to pay a certain portion of the crop to the laborer for his services in raising the crop; such laborer is then a 'cropper'; as elsewhere defined, a 'cropper' is a person hired by the landowner to cultivate the land and raise a crop thereon and to receive for his labor a share of the crop which he works to make and harvest. According to the prevailing view, a cropper has no estate in the land, nor as a general rule in the crop, until the landlord assigns him his share.... [T]he essential difference between a cropper and a tenant is that a tenant has an estate in the land for his term and, consequently, a right of property in the crop which he grows. If he pays a share of the crop as rent, it is he who divides the crop and turns the landowner's share over to him, having, until such division, the entire property and right of possession of the whole. A cropper, however, is as much a servant as if his wages were fixed and payable in money, and his possession of the crop is only that of a servant, which is in law that of the landlord, who must set off to the cropper his share thereof.

21A Am.Jur.2d, Crops, § 35 at 644–646.

In determining whether the relationship of the parties was that of "owner and cropper" or "landlord and tenant", the most important factor is the actual intention of the parties and the terms of the specific contract involved. As one authority has noted:

> The general rule is that the question whether the relation of the parties is that of landlord and tenant, landowner and cropper, participants in a common venture, or some other relationship, must turn upon the actual intention of the parties as gathered from the entire contract, the language in which it is cast, and the circumstances surrounding its execution. If the import of the agreement is doubtful, the actions of the parties to it may furnish a satisfactory guide for its construction. In any event, where an agreement or contract to farm on shares is oral and informal and the evidence is conflicting, the question as to what legal relation was created is essentially a question of fact. (footnotes omitted).

21A Am.Jur.2d, Crops, § 38 at 647–649.

Plaintiff points to the September 13, 1982 letter from Varney to Stroh, certain discussion between the parties as to the time and manner of harvesting the crops, and the failure of Stroh to pay Varney an installment on the obligation in favor of interpreting this arrangement as a cropping agreement. The Court, however, as trier of fact, has interpreted the circumstances of this arrangement differently. Instead, the Court is persuaded that a number of circumstances militate in favor of finding a lease arrangement.

The letter of September 13, 1982, contrary to Plaintiff's argument, does not evidence a cropping arrangement. Plaintiff argues that the references in the letter to "our corn", the proposed price of $7250 "after drying and other costs", and the offer to help transport the corn, as evidence of a cropping arrangement. The above references, however, focus on narrow details of the arrangement between the parties and ignore surrounding circumstances and actions of the parties leading to a contrary interpretation.

The parties never reached a formal written agreement. If they had an oral contract, the only clear evidence of an agreement is that Stroh agreed to pay Varney

$125 per acre for his 58 acres of land. The parties agreed on little else.

The actions and conduct of the parties, under the circumstances, more nearly evidence their intentions. After Varney and Stroh met in early March of 1982, Stroh never provided Varney the written contract he promised. Instead, Stroh entered on the land and in the spring of the year commenced planting the crops in question. Although Varney was unsuccessful in obtaining a written agreement, having never attempted to remove Stroh from his farm, he apparently assented to Stroh's continuing occupancy of his farm and the planting of the crop. Indeed, Plaintiff argues that he expected but never received a partial installment in July 1982 of the money Stroh was to pay him.

The only other time the parties communicated was on September 11, 1982, about the time the crops were ready for harvest. Having neither written contract or money, Varney understandably made a desperate attempt to formalize an arrangement by which he would receive something, either money or crops, for the use of his land. The evidence shows, however, that beyond agreeing to pay $125 per acre for the use of the land, Stroh never assented to either the terms expressed at the meeting on September 11, 1982 or in the letter following on September 13, 1983.

The circumstances of the arrangement, on the contrary, more nearly comport to a lease than a cropping agreement. From the beginning Varney expected to obtain a "lease" from Stroh. He expected, but never received, a money payment in July which, again, more nearly evidences a lease. Finally, in his letter of September 13, 1982, Varney indicates he is "satisfied with the arrangement regarding the lease payments." These words of demise, in conjunction with other circumstances in this case, strongly favor the finding of a lease. *See generally* 21A Am.Jur.2d, Crops, § 79; Annot. 95 A.L.R.3d 1013.

Despite the fact that the parties discussed the time when the crops were to be harvested and that Stroh agreed to leave the corn stalks in the field as silage for Varney's beef cattle, Varney exercised paramount control in the manner in which the farming operation was conducted on the premises. As indicated earlier, Varney had no contact with Stroh from the initial meeting in March until harvest time was near in September. In addition, the record clearly reflects that Stroh only entered into lease arrangements in his farming operations since generally his lessors did not condone the large volume of fertilizer he employed in an effort to maximize his yield of crops. Stroh's exercise of control, then, further evidences a lease.

Plaintiff contends that since Stroh did not make the July payment as expected, he can be said to have contributed necessary supplies to a cropping arrangement. There is no evidence, however, that, in fact, the parties acted in this manner. Stroh merely missed his payment. There is nothing to show that there was any money on hand to pay Plaintiff and that, instead of making the installment, Stroh used the money for labor costs, fuel, or anything else. On the contrary, the only evidence in the record is that Stroh furnished all the needed supplies and equipment that actually produced the crop.

The other factor urged by Plaintiff in support of the finding of a cropping arrangement, his offer to help transport the crops to the grain elevator for sale, does not change the Court's view of the parties' arrangement. In sum, the Court finds that notwithstanding the lack of a formal written agreement, considering all the circumstances, the parties through their actions established a landlord-tenant relationship. Ownership of the crop, therefore, was in Stroh and, since the filing of the petition in bankruptcy, the trustee.

Plaintiff argues that regardless of whether or not the parties' relationship was characterized as "owner and cropper" or "landlord and tenant," since plaintiff let his farm to Stroh reserving "rent in kind" in the form of a $7,250 share of the crop, by rule of the courts in Ohio, a tenancy in common in the crop was created. Further-

more, pursuant to the provisions of § 1917.34 Ohio Revised Code, it is argued that since plaintiff's interest is unassailable by a judgment creditor of the debtor, it is similarly immune from any claim of the trustee in bankruptcy. The Court, however, finds that neither the rule of the courts nor the statute in question are applicable in the case *sub judice.*

Plaintiff has accurately stated the rule, recognized by the Ohio courts, which, in certain circumstances, changes that common law rule governing ownership of crops between landowner and cropper, on the one hand, and landlord and tenant, on the other. As previously stated, the former relation created ownership of the crops in the landowner, the latter in the tenant. The Ohio courts, however, in certain circumstances, have recognized a different rule.

The manifest injustices that ensued led to legislation in some states, and in others to adjudications of the courts that tended to avoid the mischief that resulted from creating the farmer in one case and the owner in the other, a mere creditor of his associate in the joint enterprise. 1 Tiffany on Landlord and Tenant, 38 and 183, Sections 10 and 20; 2 Tiffany on Landlord and Tenant, 1648, Section 253.

As a result of these departures from the common law, it is the well-nigh universal rule that every form of contract by which the use of land is given to one who is to cultivate it and *give the owner as compensation therefor a share of the crop,* creates a tenancy in common in the crop, and this is so whether the agreement between the parties is a lease or a mere cropping contract. *Second National Bank of Circleville v. Hyde,* 29 Ohio App., 357 at 363, 163 N.E., 587. See, also, 98 Am.St.Rep., 959. (emphasis added)

*Stoner v. Markey,* 63 Ohio App. 459, 464, 27 N.E.2d 176, 179 (1940). Thus, notwithstanding whether the parties' relation was characterized as owner and cropper or landlord and tenant, when the compensation for use of the land is paid as a share of the crop, the parties become tenants in common in the crop.

If this rule were applicable in this case, the interest of either landlord or tenant in the crops, as the case may be, would be protected from a judgment creditor of the other under the provisions of § 1917.34 Ohio Revised Code. The statute provides as follows:

When the lands have been let, reserving rent in kind, and the crops or emblements growing, or grown thereon, are levied on or attached by virtue of execution, attachment, or other process, against the landlord or tenant, the interest of such landlord or tenant against whom process was not issued is not affected thereby. The crops or emblements may be sold, subject to the claim or interest of the landlord or tenant against whom process did not issue.

Plaintiff in this case, however, cannot claim an interest in the crops as a tenant in common or claim the protection against a judgment creditor provided by § 1917.34 R.C. The rule of the courts creating the relation of tenants in common and the protection offered by the statute apply only where the compensation reserved for use of the land is "a share of the crop" or "rent in kind" respectively. As previously determined, the contract between the parties in the present case called for payment of rent in money. This case does not involve circumstances where either "a share of the crop" or "rent in kind" was reserved. As a result, Plaintiff is neither tenant in common nor entitled to protection against the trustee as a judgment lien creditor but is left with an unsecured claim.

Last of all, Plaintiff asserts the existence and application of the so-called "advancement theory" under *Second National Bank v. Hyde, supra. See also, Case v. Hart,* 11 Ohio 364 (1842); *Liggett v. American Cigar Company,* Ohio N.P. (n.s.) 28, 31 Ohio Dec. 10 (C.P.1918); *Mouser v. Davis,* 9 Ohio Dec. Reprint 237 (Pickaway Dist.Ct.1884); *McLeary v. Snider & Co.,* 2 Ohio Dec. Reprint 59 (C.P.1859). Under this theory, Plaintiff argues, one who ad-

vances money, seeds, implements, or otherwise assists the farmer in cultivating a crop becomes a tenant in common with the cultivator in the crop and has an interest unassailable by the creditors of the cultivator. None of the cases cited in support of the so-called "advancement theory", however, support its existence or application. In *Second National Bank v. Hyde, supra,* for example, the rule previously stated, which recognizes the existence of a tenancy in common in crops when the consideration for the use of land is a share of the crops, was stated and applied. The Court then applied section 10433 of the former General Code which parallels the provisions of § 1917.34 R.C., previously discussed, in upholding the landowner's claim to crops as against an alleged third party judgment lien creditor. Thus, although the case involved an advancement of money, its holding rests on other legal grounds. Furthermore, even if the "advancement theory" plaintiff urges existed, as previously discussed, plaintiff made no advancement in this case of any kind, much less one of sufficient magnitude to bring this case within the realm of *Hyde.*

In sum, none of the theories advanced by Plaintiff being sufficient to sustain his claim to the interest of the crops in question, Plaintiff has an unsecured claim for $7,250.00.

For the foregoing reasons, good cause appearing, it is therefore,

ORDERED that Plaintiff's complaint be, and it hereby is, dismissed, and Plaintiff is hereby allowed a general unsecured claim in the amount of $7,250.00.

SO ORDERED.